ANITA HARRISON, etc.,

        Plaintiff,

-vs-                         Case No.  5:08-cv-333-Oc-10GRJ

GARY BORDERS, etc., et al.,

        Defendants.

_____

## O R D E R

On August 12, 2006, Clayton Harrison was killed by a fellow inmate in the Lake County Jail.  The Plaintiff has filed a two-count complaint against the Defendants alleging a claim of deliberate indifference to decedent Clayton Harrison's constitutional rights under 42 U.S.C. § 1983 and a state law claim for wrongful death.  The case is before the Court for consideration of the Defendants' motions for summary judgment (Docs. 30-31), to which the Plaintiff has filed timely responses in opposition (Docs. 35-36).  For the reasons set forth below, the Court finds that both motions are due to be granted.

### Undisputed Facts and Procedural History

I.    The Parties

Plaintiff Anita Harrison is the mother of decedent Clayton Harrison, and the personal representative of his estate.  On August 12, 2006 - the date of Harrison's death - he was a pretrial detainee held at the Lake County Jail.  Defendant David Loren Mudd, who was also a pretrial detainee at the Jail, killed Harrison during a fight in their cell.

Defendant Gary Borders has served as the Sheriff of Lake County, Florida since October, 2006. At the time of Harrison's death, Borders held the position of Chief Deputy and Director of the Lake County Jail. In that position, he was in charge of the overall operation of the Jail, and had been in charge of the Jail for over 15 years. Ms. Harrison has sued Borders in his official capacity only.

Defendant Jeremy Turner has been an employee of the Lake County Sheriff's Office for 14 years. He currently holds the rank of Corporal. Defendant Chris Comis has been employed by the Lake County Sheriff's Office as a Deputy Sheriff for eight (8) years. He is also certified as a Corrections Officer, and previously worked as a Corrections Officer at the Citrus County Jail. Defendant Lyman Drake is a twenty (20) year veteran of the Lake County Sheriff's Office and is employed as a Corrections Officer. Turner, Comis, and Drake were all working at the Lake County Jail at the time of Harrison's death. Ms. Harrison has sued these three Defendants in both their individual and official capacities.

II.    The Lake County Jail

On August 12, 2006, Clayton Harrison was assigned to Cell 25 in Unit C-1 at the Jail. Unit C has four sections with 32 beds each. The 32 bed sections have 16 cells. Generally, only two inmates are assigned to each cell. However, depending on the inmate population, there can be as many as three (3) to four (4) persons assigned to a cell.

Each unit at the Jail has a different level of classification. Unit C is considered maximum security general population. An inmate's security classification level determines where he is placed within the facility, however, known predatory inmates are generally

2

housed in administrative segregation, apart from the general population. Classification is based on the inmate's pending charges, past behavior, flight risks, and other factors. When Clayton Harrison arrived at the Jail on July 28, 2006, he was assessed at the maximum security level due to his pending charge of escape and history of prior escapes, and was assigned to Unit C. Harrison's assignment to Unit C was in accordance with the standard policies and practices at the Jail.

There are a minimum of three (3) corrections officers assigned to Unit C-1 at all times. One corrections officer will maintain constant supervision from the control room area, while the other two assigned officers move about and directly communicate with and observe the inmates. The officer in the control room has the primary responsibility for the opening of cellblock doors, the pod door, recreation area door, and the control room itself.[1] There is an intercom button located by the door into the cell area through which inmates can communicate directly with officers inside the control room. Officers can also speak to the inmates in the entire unit through the intercom system.

Cells in Unit C-1 remain open during daytime hours and are locked down at 11:00 p.m. each night. At that time, inmates are required to return to their assigned cells, and are visually checked on by corrections officers every hour until 6:00 a.m.[2] Inmates are also

---

[1]See Lake County Sheriff's Office Securities and Control Policy 6.01.10 "Staffing and Access." (Doc. 35-1, p. 1).

[2]See Lake County Sheriff's Office Policies and Procedures on Supervision of Inmates-Jail 6.04.00 (Doc. 35-5, p. 1).

required to return to their cells at various times throughout the day for meals and headcounts. In addition, inmates may be locked down in their cell during daytime hours for disciplinary reasons. Inmates are typically warned in advance that their cell is being locked down, thereby giving inmates who are not assigned to that cell an opportunity to exit the cell. However, once a cell is on lockdown, only officers patrolling the floor can see into the cell through the door's "bean slot." Officers stationed in the control room cannot see inside a locked down cell.

The Lake County Jail does not permit or condone the use of alcohol or drugs within its facility. When such contraband is found, the inmates involved are subject to administrative discipline and/or criminal prosecution. Random searches of cells and common areas are conducted on a routine basis, and corrections officers are required to inspect each cell at least once each shift.[3] All areas of the Jail occupied by inmates are patrolled at least once a day, and inmates are to be observed by a corrections officer as frequently as possible.[4]

III.    The Events of August 12, 2006

On August 12, 2006, Harrison was assigned to Cell 25, along with Defendant Mudd and inmate Carey Boyd. At that time, the Jail was over crowded, therefore Harrison was

---

[3]Id. at pp. 3-4. Mudd testified that the searches were not very thorough and did not take place every day.

[4]Id. at p. 1.

sleeping on a cot (also called a "boat") while the other two inmates slept on bunk beds. Cell 25 is approximately 14 feet by 7 feet in dimension.

On August 12, 2006, Defendants Turner, Comis, and Drake were all assigned to Unit C-1, along with Corrections Officer Derek Deland. Comis and Drake came on duty that night at approximately 5:45 p.m., and it appears that Turner's shift began at around the same time. Comis and Deland were assigned as floaters in the floor area of Unit C-1, Turner was assigned to the control room, and Drake alternated between the control room and the floor.

At some point between 6:30 and 8:00 p.m., Cell 25 was placed on disciplinary lockdown.[5] At the time of the lockdown, two other inmates were also inside Cell 25: Joshua Hawkes and Jared Hudson. Hawkes entered the cell to borrow a book from Harrison. Hudson was already in the cell playing cards and talking with Harrison. It is undisputed that both Hawkes and Hudson were voluntarily inside Cell 25, and that no officer placed them in that cell, or prevented them from leaving the cell prior to lockdown. There is also

---

[5]Pursuant to Lake County Jail's policies and procedures, lockdowns are a type of informal discipline which may not exceed two (2) hours, and must be documented on a Pod Log. See Lake County Sheriff's Office Policy and Procedures on Direct Supervision 9.03.30(D) "Rules and Regulations" (Doc. 35-4, pp. 2-3). No Party has submitted a copy of the Pod Log for August 12, 2006, and there is conflicting evidence as to the length of time Cell 25 was on lockdown. Mudd testified at his deposition that they were in lockdown for over three (3) hours, and that other inmates in Cell 25 were continuously trying to get the attention of corrections officers to let them know that there were inmates in the cell who were not assigned to Cell 25. Another inmate, Joshua Hakes, testified that the lockdown took place between 6 and 6:30 p.m., and that he repeatedly asked other inmates to ask the control room to open the cell door. However, neither inmate wore a watch or could see the clock located in the common area. In contrast, inmate Marshall Jackson testified that Cell 25 was on lockdown for no more than 45 to 60 minutes, and Drake averred in his Affidavit that he locked down Cell 25 at approximately 8:00 p.m.

some evidence that Harrison convinced Hawkes and Hudson to stay in the cell during the lockdown.

While the inmates were locked down in Cell 25, they were playing cards and talking. Harrison and some of the inmates were also drinking homemade wine, or "buck." Mudd did not drink any of the wine. Once the cell was locked down, the inmates inside were not able to access the intercom system. The only way they could have any contact with the officers was through the "bean slot" on the door while the officers were patrolling the Unit, or by asking other inmates not on lockdown to relay a message through the intercom system. Hawkes testified that he asked other inmates in Unit C-1 to buzz the control room to request that Cell 25 be opened, but Hawkes does not know what the inmates actually told the officers, or if any of the officers were aware that there were five inmates in the Cell.

At some point in time, Harrison and Mudd exchanged words over consumption of the "buck" and Mudd began to flush the remnants of the wine down the cell's toilet. Harrison pushed Mudd, who responded by striking Harrison in the head with a closed fist and then shoving him in the face. Harrison was knocked unconscious. The other inmates tried to revive Harrison by splashing water on his face, but when they realized he was not breathing they called out "man down." An officer arrived at the cell soon thereafter.[6]

---

[6]Hawkes testified that a guard and nurse arrived within five minutes. Mudd testified that it took 10-20 minutes for anyone to come to the cell. The Defendants contend that they arrived at the cell as soon as they were notified of a problem. The wait time is largely irrelevant as Ms. Harrison has not alleged a claim for denial of medical care, deliberate indifference to medical needs, or negligence based on improper medical care.

Three nurses responded to the cell and began CPR at 8:53 p.m. Emergency Medical Services arrived at 8:59 p.m., and transported Harrison to the hospital at approximately 9:11 p.m., where he was subsequently pronounced dead.

Deputy Drake was the officer who placed Cell 25 on lockdown. At the time, Drake was inside the control room, and had previously warned inmates that they would be locked down in their cell if they kept utilizing the intercom system for improper purposes. Every time the intercom button is pushed, an officer inside the control room must respond, and inmates in the Unit had been abusing the system, thereby placing the security and order of Unit C-1 at risk. Immediately after Drake announced this warning over the intercom system, an inmate buzzed on the intercom to request that Drake open Cell 21.[7] When Drake asked the inmate what cell he resided in, he responded that he was in Cell 25. Drake then instructed the inmate to return to Cell 25 as he was going to be locked down. The inmate returned to his cell as instructed. At that time, Drake was not aware that any inmates who were not assigned to Cell 25 were inside the cell, or that there were five inmates in the cell. It is against Lake County Jail policy to lock down five inmates in a single cell.

Shortly after Cell 25 was locked down, Drake left the control room to relieve another officer who was scheduled for a break. He planned to address the lock down of Cell 25

---

[7]Although Drake was unaware of the identity of the inmate who buzzed the intercom, there is some evidence suggesting that it was Harrison. It is also undisputed that the inmate who did push the intercom buttom identified himself as residing in Cell 25.

when he returned.  By the time Drake returned, Harrison had already been removed from the Cell and transported to the hospital.  Drake contends that he warned the inmates in Cell 25 prior to locking the door, and that the inmates all had ample opportunity to exit.  However, Hawkes and Mudd testified at their depositions that they were not given any advance warning prior to the lockdown and did not know why the cell was locked down.  Mudd also testified that no one patrolled Cell 25 after it was placed on lockdown.[8]

Comis first became aware that Harrison was locked down in Cell 25 when he was making rounds with a nurse who was dispensing medication to inmates.  At approximately 8:40 p.m., Comis spoke with Harrison through the cell door's bean slot.  Harrison asked Comis when he would be released from lockdown.  Comis informed Harrison that he would need to wait until Drake returned to the control room, at which time Harrison would be released from the cell.[9]  From where Comis was standing, he could not see who else was inside Cell 25.  According to Comis, Harrison did not appear to be intoxicated, agitated, overly anxious, or in distress.  Harrison did not state that he had been threatened or that he required any type of immediate assistance.  Harrison also did not notify Comis that there were five inmates in Cell 25, or that inmates not assigned to the cell were locked inside.

Approximately ten (10) minutes after Comis' conversation with Harrison, Corporal

---

[8]There is no policy specifically requiring officers to patrol a cell at any set intervals once it has been placed on lockdown.  However, there are general policies requiring officers to patrol the cells and unit in general as often as necessary.

[9]Mudd initially testified that this conversation between Harrison and Comis did not take place. Upon further questioning, however, he admitted that from his position in the cell he could not be certain who Harrison was talking to through the bean slot.

Turner notified Comis that there was an emergency in Cell 25. Comis immediately went to Cell 25, where he observed Harrison unconscious, sitting on the floor leaning against the wall. While medical attention was called, Comis began the process of locking down the other inmates and securing Unit C-1. The four other inmates in Cell 25 were moved to the multipurpose room.

It is not clear from the record exactly when Turner learned that Cell 25 had been placed on disciplinary lockdown. It was Turner's intention that Cell 25, and another cell that was also on lockdown would be opened after the nurse completed her rounds in the Unit and had dispensed all medication. Turner was stationed in the control room, and from his position it was not possible to see into the interior or Cell 25 once it was on lockdown.

It is also not clear how much time passed from when the fight between Harrison and Mudd took place and when Turner was notified. It is undisputed that Charles Holiday, another inmate in Unit C-1, advised Turner that one of the inmates in Cell 25 "fell out." Turner immediately went to the cell, saw Harrison unconscious, and entered the cell. At that time Harrison did not have a pulse, and Turner immediately called for the nurse, who began CPR, and called for Emergency Medical Services.

Other than the fight with Mudd, there is no evidence that Harrison was in any danger. There was no history of violence on the part of either Harrison or Mudd - between each other or any other inmates - and neither inmate had any record of disciplinary action while at the Jail. Mudd testified at his deposition that he had been assigned to the same cell as Harrison for several days and had no prior problems with Harrison. Other inmates,

including Hawkes, similarly testified that there were no issues between Harrison or Mudd and that up until the fight, everyone was getting along. No inmate reported any prior complaints by Harrison, and there is no evidence that Harrison ever voiced any concerns, threats, or fears to an inmate or officer. There is also no evidence in the record of any violent behavior on the part of any inmates at the Lake County Jail at any time.

Although Mudd testified that Harrison had been acting "crazy, silly drunk" prior to the fight, and stated that he would "knock [Mudd's] old ass out," there was no prior incident of violence or animosity which would suggest that a fight was imminent, and there is no evidence that anyone else heard Harrison's statement or knew about it. Mudd also testified that he generally got along with Harrison fine. The fight between Mudd and Harrison lasted approximately 5 seconds, and concerned the disposition of the remaining "buck." The two additional inmates in the cell - Hawkes and Hudson - were not involved in the altercation in any way.

Harrison's death was the first inmate death that has occurred at the Jail as a result of an inmate upon inmate assault. The official cause of Harrison's death was listed by the Medical Examiner as homicide due to blunt force trauma of the head. Mudd initially denied any involvement in Harrison's death, and claimed that Harrison slipped on some water on the floor of the cell and hit his head. However, he later admitted that he hit Harrison, and was ultimately convicted of manslaughter. Harrison is survived by his mother and two minor children.

IV.     Procedural History

Ms. Harrison originally filed a three (3) count complaint against the Defendants on August 12, 2008 (Doc. 1).   Defendant Mudd, who remains in state custody and is proceeding *pro se*, filed an answer on September 29, 2008, while the other Defendants moved to dismiss (Docs. 11-12).  The motions to dismiss were denied (Doc. 23), and Ms. Harrison filed an Amended Complaint on October 23, 2009 (Doc. 26).  On May 12, 2009 and November 12, 2009, Ms. Harrison voluntarily dismissed all claims against Defendant Borders in his individual capacity, and all claims against Defendants Zeke Reams, David Mass, Robert Tretter, and John Meeks (Docs. 22, 27).

The Amended Complaint, which controls this case, consists of two claims: (1) a claim under 42 U.S.C. § 1983 against Defendants Borders, Turner, Comis, and Drake for violations of Harrison's Fourth, Eighth, and Fourteenth Amendment rights due to the Defendants' deliberate indifference to the risk of harm to Harrison by another inmate (Count I); and (2) a state law claim for wrongful death under Fla. Stat. §§ 769.16-768.27 against all Defendants (Count II).  Defendants Borders, Turner, Comis, and Drake have moved for summary judgment on all claims.  Defendant Mudd, however, has not appeared in this case since the filing of his answer to the original complaint on September 29, 2008.

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c)(2), the entry of summary judgment is appropriate only when the Court is satisfied that "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In applying this standard, the Court must examine the materials on file and record evidence "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Celetex, 477 U.S. at 324. See also Fed. R. Civ. P. 56(e)(2). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

### Discussion

I.    Count I - 42 U.S.C. § 1983 Claim for Deliberate Indifference

In Count I of her Amended Complaint, Ms. Harrison alleges that Defendants Borders, Turner, Comis, and Drake deprived Harrison of his constitutional rights when they: (1)

failed to adequately patrol Unit C-1 as required, specifically after placing five inmates in lockdown in Cell 25; (2) ignored the requests of other inmates in Unit C-1 who informed the Defendants that five inmates were in Cell 25, and that the inmates who were not assigned to that cell wanted to be released; (3) failed to secure the safety, care, and well being of Harrison by not properly observing the status of the inmates locked down in Cell 25; (4) failed to adequately monitor and supervise inmates in accordance with established procedures; and (5) imposed administrative punishment by locking the five inmates in Cell 25 and failing to observe the inmates after lockdown. See Doc. 26, ¶ 34(a)-(e). Ms. Harrison contends that the actions of these Defendants amounted to reckless and/or deliberate indifference to Harrison's fundamental right to be safe and secure while in the care and custody of the Lake County Jail. Id., ¶ 35.

Ms. Harrison further alleges that these Defendants deprived Harrison of his Fourteenth Amendment rights to liberty, substantive due process, and procedural due process; his Fourth and Fourteenth Amendment rights to be free from unlawful detention and imprisonment and right to privacy; and his Eighth Amendment right to be free from cruel and unusual punishment. Id., ¶ 37(a)-(e). However, a review of the record evidence demonstrates that her claim is really one of deliberate indifference to a substantial risk of harm - specifically the risk of inmate on inmate violence due to overcrowding -  under the

Fourteenth Amendment.[10]  Id. ¶¶ 25-30.  Therefore, the Court will focus on the claim of

deliberate indifference.[11]

## A.    Defendants Turner, Comis, and Drake (the "Individual Defendants")

### 1.    Official Capacity Claims

Ms. Harrison has sued Turner, Comis, and Drake in both their official and individual

capacities.  It is well established that claims brought against individuals in their official

capacity pursuant to 42 U.S.C. § 1983 are the functional equivalent of §1983 claims

---

[10]As a pretrial detainee, Harrison's "constitutional rights arise not from the Eighth Amendment, but from the Due Process Clause of the Fourteenth Amendment." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 n. 4 (11th Cir. 1995).  However, "[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." Marsh v. Butler County, Ala., 268 F.3d 1014, 1024 n. 5 (11th Cir. 2001).

[11]Ms. Harrison has not submitted any evidence or legal argument suggesting a violation of Harrison's privacy rights, nor has she identified any procedures that Harrison was due prior to the lock down of Cell 25.  The Lake County Sheriff's Office policies and procedures submitted to the Court merely state that lockdown is a form of informal discipline, which may be used for periods of no more than 2 hours, and must be reported on the Pod Log after the fact.  There is no stated process which must take place before such punishment may be levied.

With respect to her contentions relating to an unlawful detention or imprisonment, Ms. Harrison is correct that pretrial detainees have a liberty interest to be free from unlawful detention while incarcerated. See Bell v. Wolfish, 441 U.S. 520, 535-37, 99 S.Ct. 1861, 1872-73, 60 L.Ed.2d 447 (1979); Magluta v. Samples, 375 F. 3d 1269, 1273 (11th Cir. 2004).   However, the undisputed facts of this case do not rise to a violation of that interest.  Harrison was temporarily confined in his own cell for a period of between 40 minutes and 3 hours.  He was not segregated or placed in solitary confinement, or deprived of any his normal privileges while at the Jail.  Moreover, Ms. Harrison has presented no legal authority - and the Court has not found any - establishing that a pretrial detainee's temporary lockdown in his own cell for constitutes a violation of the Fourteenth Amendment.  Thus, even if such a claim were allowed to go forward, Turner, Comis, and Drake would be entitled to qualified immunity, because such a right has not been clearly established. See also Sandon v. Conner, 515 U.S 472, 485, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418 (1995) ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law.").

against the municipalities the individuals work for, and are unnecessarily duplicative.  <u>See</u>

<u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018,

2035 n. 55, 56 L.Ed.2d 611 (1978); <u>Busby v. City of Orlando</u>, 931 F.2d 764, 776 (11th Cir.

1991).  Because Ms. Harrison has already asserted a claim against Sheriff Borders in his

official capacity, a municipal liability claim already exists.  Therefore to the extent Count I

is alleged against the Individual Defendants in their official capacities, summary judgment

shall be granted.

### 2.    *Individual Capacity Claims and Qualified Immunity*

The Individual Defendants also contend that they are entitled to summary judgment

as to Count I in their individual capacities under the doctrine of qualified immunity.  To

establish qualified immunity, a government official must first show that he was engaged in

a "discretionary function" when he committed the allegedly unlawful acts.  <u>Holloman ex rel.</u>

<u>Holloman v. Harland</u>, 370 F.3d 1252, 1263-64 (11th Cir.2004).  If the official acted within

his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity

is not appropriate." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

The plaintiff must then satisfy a two-prong test:   (1) that the defendant violated a

constitutional right; and (2) that this right was clearly established at the time of the violation.

<u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

"Clearly established" is defined as whether "it would be clear to a reasonable [official] that

his conduct was unlawful in the situation he confronted."  <u>Id.</u> at 202, 121 S.Ct. at 2156.  "If

the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds." <u>Holloman</u>, 370 F.3d at 1264.

The evidence is undisputed that Turner, Comis, and Drake were acting within the scope of their discretionary authority on August 12, 2006. Thus, the Court need only consider whether Ms. Harrison has satisfied the two-prong test. The Supreme Court recently held that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). The Court finds that it is appropriate to first address whether a constitutional violation actually occurred.

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976-77, 128 L.Ed.2d 811 (1994) (citations omitted). However, not every instance of inmate on inmate violence "translates into a constitutional liability for prison officials responsible for the victim's safety." <u>Id.</u> at 834. A violation occurs "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." <u>Marsh v. Butler County</u>, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).

To survive summary judgment, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579, 1582 (11th Cir. 1995). <u>See also</u> <u>Purcell v. Toombs County, Ga.</u> 400 F.3d 1313, 1319 (11th Cir. 2005). "Merely negligent

failure to protect an inmate from attack does not justify liability under § 1983. . . . The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted).  Moreover, to be deliberately indifferent a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. at 1979.  <u>See</u> <u>also</u> <u>Purcell</u>, 400 F.3d at 1319-20.

Ms. Harrison's claim is that the Individual Defendants allowed five inmates to be placed in lockdown in Cell 25, did not supervise the inmates while they were in lockdown, and that such actions resulted in Harrison's death.  Under the most lenient interpretation of the law and viewing the record evidence in the light most favorable to Ms. Harrison, the Court concludes, as a matter of law, that these events fail to create a factual issue as to whether the Individual Defendants were subjectively aware of and deliberately indifferent to a substantial risk of serious harm to Harrison.

Ms. Harrison has presented no evidence establishing the existence of any substantial threat to Harrison's safety.  To the contrary, it is undisputed that Harrison never complained about Mudd or any other inmate, and never expressed any fear for his own safety - either to other inmates or to any corrections officers.  The evidence further shows that neither Harrison nor Mudd had any prior record of violent behavior of disciplinary problems, and had co-existed in Cell 25 for several days prior without any problems.  It is

also undisputed that Turner, Drake, and Comis were not aware that there were five inmates locked down in Cell 25 until after the fight was over.[12]  Moreover, the evidence shows that the fight itself had nothing to do with the number of inmates in Cell 25 - Mudd and Harrison fought over the remaining wine, and the other three inmates - Byrd, Hawkes, and Hudson, were not involved in any way.  The fight was completely unexpected and unforeseeable

Taking a broader view of the Jail in general, Ms. Harrison also has failed to produce any evidence of a history of inmate on inmate violence at the Lake County Jail as of August 12, 2006.  The only evidence before the Court of any violence at all at the Jail is the August 12 2006 fight between Mudd and Harrison, and it has been established that this fight took place without any prior notice or warning.[13]  In addition, it is undisputed that Unit C-1 was appropriately staffed and monitored at all times on August 12, 2006, and the Individual Defendants have submitted unrefuted expert testimony to support this finding.  See Doc. 32-7.  Based on the complete lack of evidence of any threat to Harrison in particular, or even a threat of inmate violence in general, the Court cannot say that there was any

---

[12]Although Ms. Harrison's admits that the Individual Defendants were not aware of how many inmates were locked down in Cell 25, see Doc. 35, pp. 9, 22, she points to the testimony of Defendant Mudd and inmate Hawkes, who both testified that they asked other inmates in the common areas of Unit C-1 to use the intercom system to notify the officers about the number of inmates in Cell 25.  However, both of these witnesses further testified that they did not know if any other inmates ever actually spoke to the Individual Defendants, nor are they aware of what was said.

[13]Mudd's testimony that earlier in the day Harrison stated he would "knock [Mudd's] old ass out" is irrelevant as there is no evidence that any of the Individual Defendants heard Harrison make this statement, or that anyone told the Individual Defendants about it.  Even if they had known of the statement, it would arguably support a claim by Mudd, who was the party threatened - not Harrison.

substantial risk to which Turner, Comis, and Drake were deliberately indifferent. <u>See</u> <u>Carter v. Galloway</u>, 352 F.3d 1346, 1349-50 (11th Cir. 2003).

Ms. Harrison points to various Lake County Jail policies and procedures which she contends the Individual Defendants violated, and thus caused Harrison's death. The policies she cites to fall into three categories: (1) general policies establishing that the Jail must maintain order and security of all inmates at all times, and must monitor inmates; (2) reporting requirements for inmate discipline; and (3) limits on the duration of informal lockdowns, and the number of inmates permitted in each cell. The Court concludes that to the extent any of these policies were violated - and other than having too many inmates in Cell 25, the evidence strongly suggests that the policies were not violated - any such violations would at most arguably amount to mere negligence. <u>See</u> <u>A.P. ex rel. Bazerman</u> <u>v. Feaver</u>, 293 Fed. Appx. 635, 659, 2008 WL 3870697, * 18 (11th Cir. Aug. 21, 2008) ("allegations that the officials failed to follow established departmental guidelines or procedures are tantamount to allegations of negligence, and are insufficient to establish subjective knowledge of a strong likelihood of serious harm."). The mere fact that too many inmates were unknowingly locked in a single cell for a relatively short period of time is not enough to inform the Individual Defendants that Harrison faced a substantial risk of serious harm.

Without any evidence of any prior inmate on inmate violence at the Jail, much less any evidence of any inmate violence due to overcrowding or complaints by Harrison himself, the Court cannot find that the Individual Defendants' actions rise to the level of

deliberate indifference. See Purcell, 400 F.3d at 1321-23; Carter, 352 F.3d at 1349-50.

See also Chatham v. Adcock, 334 Fed. Appx. 281, 292-94, 2009 WL 1788719 ** 9-11 (11th

Cir. June 24, 2009); D.S. v. County of Montgomery, Alabama, 286 Fed. Appx. 629, 2008

WL 2610762 (11th Cir. July 3, 2008). The Court therefore finds that Turner, Comis, and

Drake are entitled, at the very least, to qualified immunity because Ms. Harrison has failed

to establish a violation of a constitutional right. Summary Judgment shall be granted in the

Individual Defendants' favor as to Count I.[14]

## B.  Sheriff Borders

In Count I, Ms. Harrison also alleges that Borders, in his official capacity as Director

of the Lake County Jail and Sheriff, was deliberately indifferent to a substantial risk of harm

to Harrison due to the placement of five inmates in lockdown in Cell 25. Ms. Harrison has

sued Borders solely in his official capacity, which is the functional equivalent of a suit

against Lake County.[15]  See Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1210 n.

3 (11th Cir. 1993); Busby, 931 F.2d at 776.

---

[14]Ms. Harrison's reliance on Hale v. Tallapoosa County, 50 F.3d 1579 (11th Cir. 1995), and LaMarca v. Turner, 995 F.2d 1526 (11th Cir. 1993) is unpersuasive. In contrast to the present case, in both Hale and LaMarca, there was poor or no supervision by jail officials, and a lengthy history of inmate violence which was known by the officials.

[15]Ms. Harrison's discussion of this claim in her summary judgment papers is disjointed and confusing at best, with pages of citations to the qualified immunity doctrine, which does not apply to state actors sued in their official capacity. Ms. Harrison's reference to supervisory liability is equally confusing, see Doc. 36, p. 22, as that theory also only applies to state actors sued in their individual capacity. Because Ms. Harrison previously voluntarily dismissed all claims against Borders in his individual capacity, see Docs. 22, 27, the Court will give no further consideration to any arguments relating to individual capacity liability, and will instead focus on Ms. Harrison's official capacity claim only.

In order to hold a state actor liable under § 1983 in an official capacity the plaintiff must show that the deprivation of a constitutional right resulted from: "(1) an action taken or policy made by an official responsible for making final policy in that area of the [County's] business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." Church v. City of Huntsville, 30 F.3d 1332, 1343 (11th Cir.1994). See also Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida, 402 F.3d 1092, 1116 (11th Cir. 2005).

Because the Court has already found as matter of law that there was no constitutional violation - i.e. there was no deliberate indifference to Harrison's constitutional rights - the Court can end its analysis here and grant summary judgment in Borders' favor. See Case v. Eslinger, 555 F.3d 1317, 1328 (11th Cir. 2009); Cook, 402 F.3d at 1116-17. Even if there was a constitutional violation, Borders would be entitled to summary judgment. There is no evidence that Borders took any action - or failed to take any action - which resulted in Harrison's death. Rather, the evidence shows that Borders had no personal involvement in the actions of August 12, 2006, and was unaware of what transpired until after Harrison's death.

Moreover, Ms. Harrison has not identified any formal policies or procedures which caused or contributed to Harrison's death. To the contrary, she relies heavily on the Jail's existing policies and procedures, and attempts to establish liability by arguing that it was the Individual Defendants' failure to comply with the procedures governing reporting of

21

informal discipline and placement of inmates in lockdown that caused a violation of Harrison's constitutional rights.

Thus, it appears that Ms. Harrison is arguing that the Individual Defendants' alleged failure to comply with these policies and procedures is evidence of an improper custom or informal policy that resulted in a deprivation of Harrison's constitutional rights. However, Ms. Harrison has produced evidence of only one instance where five inmates were unknowingly placed in lockdown in a single cell, and only one instance where the informal discipline was not properly reported. This is not enough to establish a widespread custom or policy, or that such custom or policy was "taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (quoting Davis ex rel. Doe v. DeKalb County Sch. Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2000)). See also Thompson v. Spears, 336 F. Supp. 2d 1224, 1236 (S.D. Fla. 2004) (holding that a plaintiff must produce more than his own claims to prove a custom under § 1983); Engelleiter v. Brevard County Sheriff's Dept., 290 F. Supp. 2d 1300, 1313-14 (M.D. Fla. 2003) (same)

Ms. Harrison also makes mention of an alleged failure to train corrections officers - ostensibly with respect to the Individual Defendants' failure to realize that five inmates were locked down in Cell 25, and failure to properly record this informal discipline in the Pod Log. Section 1983 liability only attaches where "the failure to train amounted to 'deliberate indifference' to the rights of persons with whom the [officers] come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L.Ed.2d 412 (1989);

see also Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). Ms. Harrison has presented no evidence that Borders knew of a need to train and/or supervise his employees at the Lake County Jail on how to handle lockdown procedures, or informal discipline. "[W]ithout notice of a need to train or supervise in a particular area, [Borders] is not liable as a matter of law for any failure to train and supervise." Gold, 151 F.3d at 1351. Moreover, without an underlying constitutional violation, Borders cannot be held liable on a failure to train theory. Gish v. Thomas, 516 F.3d 952, 955 (11th Cir. 2008); see also Fowler v. Chattooga County, Ga., 307 Fed. Appx. 363, 366, 2009 WL 80265 * 3 (11th Cir. Jan. 13, 2009).

Summary judgment shall be granted in Borders' favor as to Count I.

II.    Count II - Wrongful Death

In Count II of her Amended Complaint, Ms. Harrison alleges that her son died as a result of the Defendants' negligent conduct, and that the Defendants are liable under the Florida Wrongful Death Act, Fla. Stat. §§ 768.16 - 768.26. Doc. 26, ¶¶ 39, 41. She sues Borders in his official capacity, and Turner, Comis, and Drake in their official and individual capacities.

**A.    Individual Capacity Liability**

Turner, Comis, and Drake contend that they are entitled to summary judgment in their individual capacities because such claims are barred by Fla. Stat. § 768.28(9)(a), which provides:

No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).

Under this statute, governmental employees are clothed "with individual immunity that is lost only as to torts committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights and safety." Castellano v. Raynor, 725 So. 2d 1197, 1198 (Fla. 2d DCA 1999). "Although the statute does not define 'bad faith' under section 768.28(9)(a), '[b]ad faith has been equated with the actual malice standard.'" Parker v. Fla. Bd. of Regents, 724 So. 2d 163, 167 (Fla. 1st DCA 1998) (quoting Ford v. Rowland, 562 So. 2d 731, 734 (Fla. 5th DCA 1990)) (alteration in original). "[T]he phrase 'wanton and willful disregard' connotes conduct much more reprehensible and unacceptable than mere intentional conduct." Richardson v. City of Pompano Beach, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987).

Taking the facts in the light most favorable to Ms. Harrison, the Court finds that Turner, Comis, and Drake are entitled to statutory immunity. There is no evidence establishing - or creating a genuine issue of material fact- that any of these Defendants acted with actual malice towards Harrison, or with "wanton and willful disregard" to Harrison's constitutional rights. As discussed at length above, the Defendants had no idea

24

that five inmates were locked down in Cell 25, or that a fight would ensue between Harrison and Mudd. There is also a lack of any evidence suggesting any animosity on the part of the officers towards Harrison. Accordingly, Turner, Comis, and Drake are entitled to summary judgment as to the individual capacity portion of Count II.

## B. Official Capacity Liability

Ms. Harrison has also sued all of the Defendants in their official capacity. The Parties agree that official capacity claims for negligence exist under Florida law. <u>See</u> Fla. Stat. § 768.28(1). However, the official capacity claims against Turner, Comis, and Drake are duplicative of the claim against Borders, and cannot go forward. <u>See</u> Fla. Stat. §§769.19, 768.28(9)(a) (holding that "[t]he exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state . . . shall be by action against the governmental entity, or the head of such entity in her or his official capacity. . . ").

To state a claim for negligence in Florida, a plaintiff must show: (1) a legal duty on the defendant to protect the plaintiff from particular injuries; (2) the defendant's breach of that duty; (3) the plaintiff's injury being actually and proximately caused by the breach; and (4) the plaintiff suffering actual harm from the injury. <u>Clay Elec. Coop., Inc. v. Johnson</u>, 873 So. 2d 1182, 1185 (Fla. 2003). Ms. Harrison contends that Borders breached his duty to keep Harrison safe and secure, and that Harrison's death was actually and proximately caused by the breach.

Normally such claims for negligence involve the resolution of fact intensive issues and are best left for the trier of fact to resolve.  However, in this case, the Court finds that summary judgment is warranted.

> In most cases, as here, injuries sustained by an inmate as the result of an assault upon him by another inmate are indirect rather than direct results of any negligence by the custodian. The actual injuries (damages) are a direct result of an active and efficient cause which has intervened between the custodian's negligence and the intentionally inflicted injury.  In order to find that the custodian's negligence was a proximate cause of the injury it must be shown that the injury was a reasonably foreseeable consequence of that negligence.

Spann v. Department of Corrections, 421 So. 2d 1090, 1092 (Fla. 4th DCA 1982)

Ms. Harrison has put forth no evidence - other than her own broad suppositions - to support her contention that there was a foreseeable risk of harm to Harrison at any point in time.  There is absolutely nothing in the record demonstrating that Harrison's death at the hands of his cellmate was foreseeable.  None of the officers on duty on August 12, 2006 were aware of any risk of violence - between Harrison and Mudd or between any other inmates.  And it is undisputed that no one knew that there were five inmates in Cell 25 at the time of the fight.  Moreover, there is no evidence that the fact that there were five inmates in the cell had anything to do with Harrison's death, either as a result of overcrowding or by a showing that an interloper caused the assault; Harrison was killed by his usual cellmate.  Thus, while the chance that two cellmates would get into a fight while on lockdown is perhaps a possible consequence of placing the cellmates on lockdown, it was not a probable consequence under the undisputed facts of this case, and therefore

was not foreseeable.  See Spann, 421 So. 2d at 1093; Overby v. Wille, 411 So. 2d 1331, 1332-33 (Fla. 4th DCA 1982); Guice v. Enfinger, 389 So. 2d 270, 271 (Fla. 1st DCA 1980).[16]

Without any evidence of foreseeability, the Court finds as a matter of law that Borders is entitled to summary judgment.

### Conclusion

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)    Defendants Jeremy Turner's, Chris Comis' and Lyman Drake's Motion for Summary Judgment (Doc. 30) is GRANTED, and the Clerk is directed to enter judgment in favor of these Defendants and against the Plaintiff as to all claims.

(2)    Defendant Gary Borders' Motion for Summary Judgment (Doc. 31) is GRANTED, and the Clerk is directed to enter judgment in favor of Defendant Borders and against the Plaintiff as to all claims.

(3)    The Clerk is directed to remove this case from the trial term commencing February 1, 2010, and to TERMINATE AS MOOT the Defendants' Motions in Limine (Docs. 41, 46).

---

[16]The decisions cited by Ms. Harrision are inapposite because they both involved scenarios where there was evidence of foreseeability - in particular that the jail officials were aware that the attacking inmate had a propensity for violence, that the victim had acted in a threatened and/or anxious manner, and that there was a history of inmate on inmate violence at the jail.  See Green v. Inman, 539 So. 2d 614 (Fla. 4th DCA 1989); Dunagan v. Seely, 533 So. 2d 867 (Fla. 1st DCA 1988).

(4)    The only remaining claim is a state law claim against Defendant Mudd for wrongful death.  The Plaintiff is directed to SHOW CAUSE in writing within FOURTEEN (14) days from the date of this Order why this remaining claim should not be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3) and 28 U.S.C. § 1332.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 26th day of January, 2010.

_____

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record